**Dated: March 3, 2020**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| NAKIA A. WILLIAMS | ) | Case No. 18-14178-SAH |
| and KATY S. WILLIAMS, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| ———————————————————— | ) | |
| | ) | |
| JAMES SHREWSBURY, an individual and | ) | |
| CORY DEAN SHREWSBURY, as Trustee | ) | |
| of the JAMES LEE SHREWSBURY | ) | |
| REVOCABLE TRUST dated October 11, 2017, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Adv. No. 18-01113-SAH |
| | ) | |
| NAKIA A. WILLIAMS | ) | |
| and KATY S. WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this adversary proceeding, the Court is presented with a family dispute over money –

definitely not its first, and surely not its last.  However, the evidence regarding the dispute is

unusual in that a non-party banker, rather than one of the plaintiffs, testified about the alleged misrepresentations made by a daughter in the presence of her father. But he neither remembered those representations being made nor purported to rely on such representations. In effect, Plaintiffs' case relies entirely on representations being made to the banker, casting him as Father's "strawman." Plaintiffs appear to believe that such hearing and apparent reliance by the strawman can be shifted to Plaintiffs as a basis for excepting a debt from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(6).[1] This Court disagrees.

## JURISDICTION

The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I). Additionally, the parties have consented to this Court's entry of final orders pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012.

## BACKGROUND

In 2016, daughter Katy Williams ("Katy") asked her father James Shrewsbury ("Father") for assistance in financing the purchase of a new home for her family. Father, together with his father Eldon Shrewsbury ("Grandfather"), granted the request and borrowed $450,000.00 from Cleo State Bank ("Bank"), signing a promissory note for a term of one year and pledging three quarter sections of real property as security. The proceeds of the loan were used to purchase Katy's new home, which she owned with her husband Nakia Williams ("Nakia"). As part of the

---

[1]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

arrangement, Katy and Nakia allegedly promised to use proceeds from the sale of their existing house to pay-down the loan Father obtained on their behalf, but they were not signatories to the promissory note.[2]  A year later, in August 2017, the full loan remained outstanding and unpaid, and Father made the large interest payment due.  At that time, the original note was renegotiated and a renewal note was executed by Father, Katy, and Nakia.  Additionally, as a result of Grandfather's recent death, a new mortgage was executed in order to substitute the real property serving as collateral.  Katy and Nakia did not pledge any of their property as collateral.

Even though Katy and Nakia sold both their home and another unrelated piece of property given to them by Doris in 2017, none of the proceeds were applied to the Bank loan.  The loan matured and remained unpaid in August 2018.  Consequently, Father and Bank entered into a forbearance agreement in October 2018.  Father made another large interest payment and was also required to purchase a certificate of deposit to be applied to the interest that would come due in October 2019.

After Katy and Nakia filed for chapter 7 bankruptcy protection in October 2018, Father and Katy's brother, Corey Shrewsbury ("Corey"), as trustee of the James Lee Shrewsbury Revocable Trust dated October 11, 2017, filed this adversary proceeding asserting that losses suffered by Father in the above described transactions should be excepted from discharge under Section 523(a)(2)(A) and (a)(6).  Based primarily on the express testimony of Father, the Court disagrees.  Father and Corey, as Trustee, are not entitled to relief.

---

[2]Although not of import to this case, Doris Shrewsbury, Father's ex-wife and Katy's mother ("Doris"), also allegedly promised to use proceeds from the sale of two properties she owned to pay down the loan pending the filing and conclusion of her divorce proceeding.  Doris did, in fact, pay down a portion of the loan with her sale proceeds.

In making the following Findings of Fact and Conclusions of Law, the Court considered:

a.       The Second Corrected Final Pretrial Order [Doc. 61] (the "Pretrial Order"), entered on February 4, 2020; and

b.       The trial record, including exhibits introduced and admitted by the Court, and the testimony of Father, daughter Katy, son-in-law Nakia, Bank's president Forest Michael ("Michael"), Doris, and Corey's wife Jodi Shrewsbury ("Jodi").

## FINDINGS OF FACT

1.      Twenty years ago, Father was in an accident and suffered a traumatic brain injury. Consequently, he has some memory issues but is otherwise not impaired. Father understood the questions asked of him during trial and gave appropriate and intelligent answers during the trial.

2.      Katy and Nakia are the daughter and son-in-law of Father.

3.      Historically, Father and Katy had a close relationship, with Katy seeing him approximately three times a week, helping with groceries, eating out with him, and taking him to appointments. Corey has not historically been involved with caring for Father.

4.      After Grandfather died, Father discussed providing Katy and Corey their inheritance during their lifetime.

5.      In 2016, Katy and Nakia lived in Enid in what is referred to as the "Yucca Home." The Yucca Home was subject to a mortgage lien.

6.      In 2016, after Doris had begun living with Katy and Nakia, Katy and Doris found a house located in Enid, Oklahoma, that Katy wanted to purchase (the "Carrier Road Property").

7.      Based on Katy and Nakia's 2016 and 2017 income tax returns, they were clearly unable to afford the Carrier Road Property. (Plaintiff Ex. 32 and 33).

4

8.      Katy approached Father about helping her and Nakia purchase the Carrier Road Property.  Father looked at the Carrier Road Property and thought it was nice.

9.      Doris called Michael, Bank's president, about the possibility of a obtaining a loan to acquire the Carrier Road Property.  Michael advised Doris that Bank[3] did not make loans on residential real property.

10.     Thereafter, Father agreed to help Katy and Nakia purchase the Carrier Road Property and was willing to put up the necessary collateral for a loan.  Father believed parents should help their kids.

11.     On or about June 14, 2016, Father, Katy, and Doris met with Michael at Bank to discuss a loan to acquire the Carrier Road Property for Katy and Nakia.  It was decided Bank would loan $450,000.00 to Father and Grandfather for one year to be secured by three quarter sections of real property owned by Father and Grandfather.

12.     Michael's handwritten notes from such meeting reflect that Katy would sell the Yucca Home for $150,000.00 to $160,000.00, and Doris would sell her Edmond home for $350,000.00 to $400,000.00[4] (Plaintiff Ex. 1).[5]  Neither Katy nor Doris recall telling Michael

---

[3]Corey and Grandfather banked at Bank; Katy, Nakia, and Father did not.  This pre-existing relationship between Corey and Bank does not escape this Court's attention. It undoubtedly caused Michael's testimony to ultimately be in Corey's best interest, notwithstanding that it was utterly contrary to that of Father, Katy, Nakia, and Doris regarding what Katy and Nakia represented or did not represent.

[4]In May 2018, Doris sold her Edmond home and paid $90,000.00 to Bank.  (Plaintiff Ex. 18).

[5]It was suggested, and this Court frankly believes, that these notes were not prepared contemporaneously with the meeting but later by Michael.

what their likely sale proceeds would be, claiming that they would not know.  The handwritten notes do not contain any specific statement that their sale proceeds will be used to pay down the loan.[6]

13.   Father did not recall Katy making any representation to sell the Yucca Home and apply the sale proceeds to the loan, and Katy denies making such a representation at the June 14, 2016 meeting.

14.   Up to the June 14, 2016, meeting, Father and Katy had not talked about how a loan to purchase the Carrier Road Property would be repaid.

15.   Coming out of this meeting, Michael's understanding was that Father's only responsibility on the loan would be to provide the collateral and Father would have no responsibility for repayment.  This statement is unusual coming from a banker with over thirty (30) years of experience given that only Father and Grandfather were going to sign the Note and the Mortgage (defined below).

16.   On July 12, 2016, Bank loaned $450,000.00 to Father and Grandfather pursuant to the following (the "Loan"):

---

[6]Bank's Commitment Data Sheet (Plaintiff Ex. 2) provides Father and Grandfather are the borrowers and the sources of the collateral for the loan.  It further states the sources of repayment are Katy and Doris through the sales of their existing homes.  However, the Commitment Data Sheet is an internal Bank document signed by Michael and Bank's then-president, but not by Father or Katy, and is contrary to both of their recollections.

a.    Father and Grandfather executed a promissory note dated July 12, 2016 (the "Note") for $450,000.00 plus interest with a term of one (1) year, maturing on July 12, 2017.[7] (Plaintiff Ex. 3).

b.    Father and Grandfather executed a Mortgage dated July 12, 2016, granting a mortgage lien to Bank on three tracts of real property located in Grant County, Oklahoma, to secure the Note (the "Mortgage"). (Plaintiff Ex. 4).

Neither Katy nor Nakia executed the Note or the Mortgage, and neither the Note nor the Mortgage make any mention that the Loan will be repaid by Katy and/or Nakia or that any property of Katy and/or Nakia will be the source of repayment of the Loan.

17.    Father testified that, in obtaining the Loan and executing the Note and Mortgage, he relied on the facts that Katy was his daughter, she asked him to help, and he loved her.

18.    Father told Nakia he planned on splitting his assets between Corey and Katy and they could use that property to payoff the Loan. Doris had previously discussed with Father giving their kids an early inheritance. She did so by gifting the "Gobel Property" (her childhood home) to Katy and Corey.

19.    When the Loan closed, a check for $410,393.90 was made payable and delivered to Enid Title & Closing, LLC to fund Katy and Nakia's purchase of the Carrier Road Property. (Plaintiff Ex. 5). Katy and Nakia also received a check for $39,183.10 from the Loan closing to help them pay for furniture, appliances, and other expenses associated with purchasing a new home. (Plaintiff Ex. 6).

---

[7]Given Michael's understanding that Father had no payment responsibility on the Loan, it is inexplicable that the Note was signed by Father and Grandfather. Nothing in the Note in any way eliminates Father's primary liability to repay the Loan.

20.     After the Loan closed, Michael had no contact with Katy and Nakia until March 2017.[8]

21.     On March 13, 2017, Michael, Katy, Nakia, Doris, and Father met at Bank to discuss the Loan.  Michael felt like everyone was cooperating and all was going well.  Michael's notes, however, make no mention of any representations made by Katy and Nakia.  Instead, the only representations noted were those made by Doris regarding her assets and possible sales thereof.  (Plaintiff Ex. 9).  This is the first time Michael met or spoke with Nakia.

22.     On June 23, 2017, Katy received $102,230.29 from the sale of the "Gobel Property" jointly owned with Corey and gifted to them by Doris (the "Gobel Proceeds").  (Plaintiff Ex. 10).  That same day, Katy deposited the funds into her account at Bank during a visit there with Father and Michael.  She did not tell Michael about the Gobel Proceeds.  (Plaintiff Ex. 11 and 12).

23.     Notwithstanding that Katy deposited the Gobel Proceeds on the same date as her receipt thereof, Michael claims he only learned about the Gobel Proceeds when Corey deposited his share in Bank.  Moreover, Katy and Nakia did not have a pre-existing banking relationship with Bank.  Their primary banking institution was Tinker Federal Credit Union.  Clearly, Katy was not attempting to hide the Gobel Proceeds or she would have deposited them with Tinker Federal Credit Union rather than with Bank.

---

[8]Michael spoke with Doris in February 2017, during which time Michael learned that Doris' house was for sale and should pay off the whole loan and that Katy had received little interest from potential buyers in the Yucca Home.  (Plaintiff Ex. 8).

24.    Michael asked Katy about the Gobel Proceeds.  Although Katy disputes his recollection, Michael testified Katy told him they were retaining the proceeds to pay any necessary taxes.

25.    Katy did not apply the Gobel Proceeds to the Loan.

26.    Katy and Nakia used a portion of the Gobel Proceeds to pay down the mortgage on the Yucca Home at her Father's suggestion.  (Plaintiff Ex. 25, p. 3).

27.    The Loan matured on July 12, 2017, and was not paid.

28.    Father never asked Katy and Nakia to pay the Note.

29.    A meeting was held in mid-August 2017, to discuss the status of the matured Loan.  Michael, Katy, Nakia, Father, and Bank's attorney Larry Lahman ("Bank Attorney") were present to discuss how to proceed in light of the Loan maturity and a pending bank examination. The parties decided to enter into a new loan agreement.

30.    At no time during the meeting did Katy or Nakia acknowledge liability for repayment of the Loan, and no one at the meeting demanded that Katy and Nakia pay the Loan.

31.    On August 21, 2017, Father, Katy, Nakia, and Bank entered into the following:

      a.    Loan Agreement to repay, renew, and restructure the Loan;

      b.    Note A in the principle amount of $450,000.00, maturing on August 21, 2018 (the "Renewal Note");

      c.    Real Estate Mortgage executed only by Father pledging three quarter sections of real property to secure repayment of the Renewal Note (substitutes two tracts).

(Plaintiff Ex. 12, 13, and 14).

9

32.     Katy and Nakia signed the Renewal Note because Michael, Bank Attorney, Jodi, Corey, and Father "would feel better" if they signed the Renewal Note.[9]

33.     Father paid Bank $34,229.25 in accrued interest on the Note.  (Plaintiff Ex. 15).

34.     In connection with execution of the Renewal Note, neither Katy nor Nakia ever made any representations to Father about how the Renewal Note would be paid.  In fact, the subject was never discussed.

35.     Nakia never talked to Father about – much less tricked Father into signing – the Loan Agreement, Renewal Note, or Real Estate Mortgage; Father volunteered to do so.

36.     Neither Michael nor Father asked Katy and Nakia to pay the interest on the Loan or the Loan itself.  At this time, Katy and Father's relationship was good.

37.     In September 2017, Katy and Nakia sold their Yucca Home.  (Plaintiff Ex. 28). They received $83,495.38 in net sale proceeds.  (Plaintiff Ex. 24).

38.     Katy and Nakia did not apply the proceeds from the Yucca Home to the Loan; rather, they retained the proceeds in the event they had taxes resulting therefrom.[10]

39.     Michael admitted (i) Katy never told him the percentage of the sale proceeds from the Yucca Home to be applied to the Loan, and (ii) Nakia never talked to him about the Yucca Home proceeds.

40.     Doris never heard Katy or Nakia represent they would sell the Yucca Home and apply the proceeds to the Loan.

---

[9]Both Katy and Nakia felt "bullied" into signing the Renewal Note.

[10]Katy and Nakia eventually learned they had no tax liability from the sale of the Yucca Home, but still did not pay down the Loan with the net proceeds.

10

41.     Nakia later called Michael to discuss listing the Carrier Road Property for sale. At this time, he did not contest that he and Katy owed money under the Renewal Note.

42.     Father executed a revocable trust agreement on October 11, 2017, and appointed Corey to serve as trustee.

43.     Corey had no involvement in the Note or the Renewal Note until March 2018.

44.     After March 2018, Father and Katy's relationship soured.  Father never told her why and still never requested that she pay the Loan.  By this time, Corey was in charge of Father's finances and property.

45.     In August 2018, the Renewal Note matured and was not paid.

46.     On October 25, 2018, Father and Bank entered into a Forbearance Agreement which provided, in exchange for Bank forbearing from collection, Father would pay $29,700.00 in accrued interest on the Renewal Note and would also purchase a certificate of deposit from Bank in the amount of at least $21,600.00 to pledge to Bank as security for interest due on October 25, 2019.  (Plaintiff Ex. 19).

47.     Father paid Bank $29,700.00 in accrued interest on the Renewal Note on November 5, 2018.  (Plaintiff Ex. 20).

48.     On January 17, 2019, Father purchased and pledged a certificate of deposit in the amount of $21,600.00 in accordance with the Forbearance Agreement.  (Plaintiff Ex. 21).

49.     Michael admitted Father never stated he had an agreement with Katy and/or Nakia to pay him back for the Loan.  Michael further testified that during the period July 2016 to August 2017 neither Katy nor Nakia represented they were obligated to Father.

11

50.    Father was present, participated in, and understood the meetings at Bank on June 14, 2016, March 17, 2017, and August 17, 2017.

51.    Until Corey became involved in the Loan, Father was happy to help Katy and Nakia.

52.    Father subsequently disinherited Katy.

## Critical Representations or Lack Thereof

53.    Nakia neither made representations to Father regarding repayment of the Loan nor did he discuss repayment of the Loan with Father.

54.    Similarly, Nakia never made representations to Michael regarding repayment of the Loan.

55.    From his first meeting at the Bank on March 2017, to March 2018, Nakia never represented to Father that he and Katy would put money down on the Loan or sell the Yucca Home and apply the sale proceeds to the Loan.

56.    Nakia never spoke to Father or made any representations to Father regarding the Carrier Road Property or repaying the Loan.

57.    Per Father, Katy:

   a.    Never made any false representations to him;

   b.    Was always truthful to him;

   c.    Never lied to him;

   d.    Never tried to trick him;

   e.    Never had the intent to trick him;

   f.    Was always fair to him;

G.    Never tried to willfully hurt him;

h.    Never tried to maliciously hurt him; and

j.    Never tried to intentionally hurt him.

58.    Katy and Nakia never promised to sell the Yucca Home to pay down the Loan; rather, Father assumed they would.

59.    Father understood only he and Grandfather executed the Note and Katy and Nakia did not.

### APPLICABLE CODE PROVISIONS AND CAUSES OF ACTION

Section 523(a)(2)(A) and (a)(6) provides as follows:

a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

(2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

(6)    for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

### LEGAL ANALYSIS

In their complaint, Father and Corey claim that Katy and Nakia made false representations to Father to induce him to enter into the Loan and pledge his property as collateral.  Father and Corey seek to except the damages incurred by Father as a result of the Loan as debts having been incurred based on either fraudulent misrepresentations by Katy and Nakia to Father pursuant to Section 523(a)(2)(A) or willful and malicious conduct by Katy and

13

Nakia towards Father under Section 523(a)(6).  In simple terms, Father and Corey desire to prevent Katy and Nakia from obtaining their fresh start in bankruptcy based on conduct that suggests they are not "'honest but unfortunate debtor[s].'"  Grogan v. Garner, 498 U.S. 279, 286 (1991) (citing Local Loan Co., 292 U.S. at 244).

"One of the central purposes of the Bankruptcy Code is to provide the debtor with a 'fresh start.'"  In re Goodale, 604 B.R. 252, 254 (Bankr. D. S.C. 2019) (citing In re Thoennes, 536 B.R. 680, 694 (Bankr. D. S.C. 2015) (citing Grogan v. Garner, 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L.Ed.2d 755 (1991))).  To preserve the debtor's "fresh start," exceptions to discharge must be interpreted narrowly.  Id. (citing Kawaauhau v. Geiger, 523 U.S. 57, 62, 118 S. Ct. 974, 140 L.Ed.2d 90 (1998)).  Because Section 523(a) must be construed narrowly, any doubt must be resolved in the debtor's favor.  Bellco First Federal Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997).  The **creditor** seeking to except a debt from discharge **has the burden of proving each element** of its claim by a preponderance of the evidence.  Grogan, 498 U.S. at 286.

## I.    FATHER AND COREY DID NOT PROVE THEIR SECTION 523(a)(2)(A) CLAIM.

Section 523(a)(2)(A) excepts from discharge a debt for money, property, or services obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  Most Section 523(a)(2)(A) adversaries brought to except debts on account of a debtor's fraud involve misrepresentations.

See McClellan v. Cantrell, 217 F.3d 890, 892-93 (7th Cir. 2000).[11]  In the Tenth Circuit, courts have repeatedly held that, to prevail on a claim under Section 523(a)(2)(A) for misrepresentation, a creditor must prove the following elements:  (i) the debtor made a false representation; (ii) the debtor made the representation with the intent to deceive the creditor; (iii) the creditor relied on the representation; (iv) the creditor's reliance was justifiable; and (v) the debtor's representation caused the creditor to sustain a loss.  Johnson v. Riebesell  (In re Riebesell), 586 F.3d 782, 789 (10th Cir. 2009); Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996);[12] Cooper v. Lemke (In re Lemke), 423 B.R. 917, 921-22 (10th Cir. BAP 2010).

This Court need go no further than the first and third elements of a Section 523(a)(2)(A) claim – a false representation by the debtor on which the creditor relied – to conclude Father and Corey are not entitled to relief under Section 523(a)(2)(A).  To satisfy the first element under Section 523(a)(2)(A), Plaintiffs must prove the debtor made an express or implied representation that is false at the time it was made.  The Bank of Fayette County v. Hampton (In re Hampton), 550 B.R. 773, 792 (Bankr. E.D. Ark. 2016); Sullivan v. Glenn (In re Glenn), 502 B.R. 516, 531 (Bankr. N.D. Ill. 2013).  However, Father unequivocally testified that Katy never made any misrepresentations to him and never promised him that she would repay the Loan.  Father also testified Nakia never even spoke to him about the Loan, the Carrier Road Property, or paying him

---

[11]False pretenses and actual fraud are additional grounds for relief under Section 523(a)(2)(A).  However, it is clear from the Pretrial Order that Father and Corey rely exclusively on representations purportedly made by Katy and Nakia as a basis for their relief thereunder.

[12]In Young, the creditor's reliance was required to be "reasonable."  Subsequent to the issuance of the opinion, the reliance standard became "justifiable" under Section 523(a)(2)(A). Turner v. Deutsche Fin. Serv. Corp. (In re Turner), 2003 WL 23838108 (Bankr. D. Kan. 2003) (citing Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)) (justifiable reliance is a subjective standard and less demanding than reasonable reliance).

back.  And Father never identified any representation being made by either Katy or Nakia at any time during the procurement and renewal of the Loan.  Similarly, Katy and Nakia denied making any representations to Father.  Their testimony was confirmed by Doris who was present at the June 14, 2016, and March 13, 2017, meetings where the representations were allegedly made.

The Court would be remiss if it did not address the testimony of Michael.  A great deal of time his testimony at trial related to his recollection of representations made by Katy in his and Father's presence.  **Father recalled none of those representations**.  To the extent representations were made to Michael and Bank, Michael and Bank are not plaintiffs in this adversary proceeding.  The Court could find no authority for excepting from a debtor's discharge a debt based on misrepresentations made to a third party or strawman such as Michael.  Certainly, courts have been reluctant to impute liability to a debtor for misrepresentations made by a third party except when made by an agent or partner of the debtor.  Glenn, 502 B.R. at 536; Bromberg v. Gregory (In re Gregory), 2013 WL 4516657 (Bankr. D. Colo. 2013); Duggins v. Bratt (In re Bratt), 489 B.R. 414, 423-24 (Bankr. D. Kan 2013); First New Mexico Bank v. Bruton (In re Bruton), 2010 WL 2737201 (Bankr. D. N.M. 2010).  Applying the logic of these cases, no evidence before the Court suggested that Michael was acting as Father's agent or partner.  In fact, prior to the Loan, Father had no relationship with Bank, and his purpose in interacting with Michael was to obtain the Loan from Bank as a borrower, not to engage Michael as his agent or partner.  Rather, Michael was acting as agent for Bank, and therefore, his testimony and the documentary evidence from Bank's files reflects only representations made to Bank.

16

Thus, Father and Corey failed to establish the first and essential element to a Section

523(a)(2)(A) false representation claim – "that [Katy and Nakia] made an actual

misrepresentation or a false representation to [him]." Owen v. Angst (In re Angst), 428 B.R.

776, 790 (Bankr. N.D. Ohio 2010); Americash Loans, LLC v. Marquardt (In re Marquardt),

561 B.R. 715, 724-25 (Bankr. C.D. Ill. 2016).

The Court could end its analysis here because without an actual false representation, there

can be no corresponding intent to deceive, no reliance, and no loss proximately caused thereby.

Angst, 428 B.R. at 790; Wells v. Parker (In re Parker), 2012 WL 7991473 (Bankr. S.D. Ohio

2012). But, even assuming Father established misrepresentations by Katy and Nakia, such

misrepresentations do not provide a basis for excepting any related debt from their discharge

under Section 523(a)(2)(A). Father's testimony eliminated any possible reliance by him on Katy

and Nakia's purported representations. In his own words, Father's motivation and purpose in

entering into the Loan, signing the Note, and mortgaging his real property as collateral was

clear – because he loved and wanted to help his daughter. In fact, Father believed it was "his

duty" to help his daughter. "'In order to rely on a misrepresentation,' the party making the

nondischargeability claim 'necessarily must first be deceived.'" Graham v. Graham (In re

Graham), 600 B.R. 90, 96 (Bankr. D. Kan. 2019) (citing In re Taylor, 455 B.R. 799, 802 (Bankr.

D. N.M. 2011), aff'd, 478 B.R. 419 (10th Cir. BAP 2012), aff'd, 737 F.3d 670 (10th Cir. 2013)).

Simply put, Father did not rely on any representations by Katy and/or Nakia in entering into the

Loan; he entered into the Loan based on his love for his daughter and his desire to do the right

17

thing because that is what fathers do.[13]  Furthermore, Father fully understood only he and

Grandfather signed the Note, and repayment of the Loan was his obligation rather than Katy and

Nakia's.

Having failed to prove false representations and Father's reliance thereon to any degree,

much less by a preponderance of the evidence, Father and Corey are not entitled to relief under

Setion 523(a)(2)(A).

## II.     FATHER AND COREY DID NOT PROVE THEIR SECTION 523(a)(6) CLAIM.

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the

debtor to another entity or to the property of another entity." Section 523(a)(6) generally relates

to torts as opposed to contracts or breaches of duty.  Lockerby v. Sierra, 535 F.3d 1038, 1040-41

(9th Cir. 2008).  To prevail under Section 523(a)(6), **a creditor must prove both a willful act**

**and a malicious injury**.  Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004).[14]

Thus, an intentional tort is required, and debts resulting from recklessness or negligence are not

within the scope of Section 523(a)(6).  Barenberg v. Burton (In re Burton), 2010 WL 3422584,

---

[13]Corey's post-Loan involvement created the family dispute and apparently began the unraveling of Father's relationship with Katy and Nakia. The Court cannot help but view this suit as precipitated by Corey's efforts to protect what he saw as his rightful inheritance that was being jeopardized by Father's benevolence.  Studies show that children generally do not fight over money; however, "[w]hen they do have money quarrels, it's the parents who are likely at the heart of the problem." Sibling Money Fights are Rare, but There's a Common Cause:  Parents, CNBC Your Money Your Future (June 21, 2017).  The heart of this problem is Father likely never discussed his generous gesture to Katy and Nakia in helping them obtain a new home with Corey prior to so doing.  When Corey realized the detrimental effect of Father's actions on his likely inheritance, the "quarrel" ensued with this litigation being an effort to undo Father's perhaps overly generous actions.

[14]Without proof that the act and the injury were both willful and malicious, an objection to discharge under Section 523(a)(6) fails.  Cocoma v. Nigam (In re Nigam), 2018 WL 3768990 (10th Cir. BAP 2018).

*6 (citing Kawaauhau v. Geiger, 523 U.S. 57, 64 (1998)).  But, not every intentional tort gives

rise to a nondischargeable debt.  First Weber Group, Inc. v. Horsfall (In re Horsfall), 738 F.3d

767, 775 (7th Cir. 2013).

      The standard for a successful claim under Section 523(a)(6) is a stringent one and

requires that the debtor's objectionable conduct must have caused "willful and malicious injury,"

i.e. "that the actor intend the *consequences* of an act, not simply the act itself."  Berrien v. Van

Vuuren, 280 F. App'x 762, 766 (10th Cir. 2008) (citing Kawaauhau, 523 U.S. at 61-62, 118 S.Ct.

974, 140 L.Ed.2d 90 (1998)).  "[T]he debtor must desire to cause the consequences of his act or

believe that the consequences are substantially certain to result from it,"  Berrien, 280 F. App'x

at 766 (citing Moore, 357 F.3d at 1129).  So a creditor must establish facts that support a

reasonable inference that a debtor deliberately or intentionally caused injury to the creditor.

Barenberg, 2010 WL 3422584, *6 (citing Kawaauhau, 523 U.S. at 61).

      The Tenth Circuit applies a subjective standard in determining whether a debtor desired

to cause injury or believed the injury was substantially certain to occur.  Utah Behavior Serv. Inc.

v. Bringhurst (In re Bringhurst), 569 B.R. 814, 823 (Bankr. D. Utah 2017) (citing Via Christi

Regional Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163 (Table), *3 (10th Cir. 2000)

(the willful and malicious injury exception focuses on the debtor's state of mind)); Murphy v.

Spencer (In re Spencer), 541 B.R. 750, 758 (Bankr. D. N.M. 2015).  "When injury was 'neither

desired nor in fact anticipated by the debtor,' it is outside the scope of the statute."  Englehart,

229 F.3d 1163, *3 (quoting Kawaauhau, 523 U.S. at 62).

      To fall within Section 523(a)(6), the conduct must also be malicious.  Reperex, Inc. v.

May (In re May), 579 B.R. 568, 593 (Bankr. D. Utah 2017) (citing Sierra Chems., LLC v.

19

Mosley (In re Mosley), 501 B.R. 736, 744 (Bankr. D. N.M. 2013)); Tulsa Spine Hosp., LLC v.

Tucker (In re Tucker), 346 B.R. 844, 854 (Bankr. E.D. Okla. 2006).  An injury is malicious,

within the meaning of the dischargeability exception, if it was wrongful and without just cause or

excuse, even in the absence of personal hatred, spite, or ill-will.  Kane v. Stewart Tilghman Fox

& Bianchi Pa (In re Kane), 755 F.3d 1285, 1294 (11th Cir. 2014); In re Levasseur, 737 F.3d 814,

818 (1st Cir. 2013).[15]  "For a debtor's actions to be malicious, they have to be intentional,

wrongful, and done without justification or excuse."  Bertone v. Wormington (In re

Wormington), 555 B.R. 794, 800 (Bankr. W.D. Okla. 2016) (citing Fletcher v. Deerman,

482 B.R. 344, 370 (Bankr. D. N.M. 2012)); Tso v. Nevarez, 415 B.R. 540, 544 (Bankr. D. N.M.

2009) ("'Malicious' requires that an intentional act be 'performed without justification or

excuse.'")); AVB Bank v. Costigan (In re Costigan), 2017 WL 6759068 (Bankr. E.D. Okla.

2017).  "Malice may be implied where the preponderance of the evidence establishes that the

debtor committed acts that were 'wrongful and without just cause.'"  Costigan, 2017 WL

6759068, *5 (citing Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012)).

As plaintiffs, Father and Corey were tasked with proving by a preponderance of the

evidence that Katy and Nakia (i) deliberately or intentionally caused injury to Father, and

(ii) acted knowing such conduct was wrongful and without just cause.  Once again, however,

---

[15]Several circuit courts of appeal have adopted a formulation of "willful and malicious" under Section 523(a)(6) that incorporates a "lack of just cause."  See, e.g., Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012); Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006); Petralia v. Jercich (In re Petralia), 238 F.3d 1202, 1208-09 (9th Cir. 2001); Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986).  The Tenth Circuit has not utilized this language, but it has been employed by numerous bankruptcy courts in this Circuit.  Because the Tenth Circuit has adopted a subjective intent standard for purposes of Section 523(a)(6), this Court views the "without just cause" part of other courts' definition as an enquiry to be examined in connection with the specific debtor's subjective intent.

Father's own testimony belies any claim Katy and Nakia deliberately and intentionally harmed Father.  To summarize, Father testified (i) he was willing to help Katy and Nakia get a bigger and better house, (ii) he acted because he loved her, (iii) Katy never tricked him nor had the intent to trick him, (iv) Katy never tried to willfully and maliciously hurt him, and (v) Katy never tried to intentionally hurt him.  Per Father, Nakia never spoke to him about the Carrier Road Property or the monies owed under the Loan.  Father had spoken with Katy about providing her inheritance during her lifetime while she could use it.  And, at all times relevant to the Loan, Father, Katy, and Nakia had a good relationship.  In fact, Father voluntarily and willingly entered into the Loan and mortgaged his property because he wanted Katy to get into a bigger and better house, not because she tricked him.  "[I]t is a basic facet of our legal system that, no matter how improvident it may seem to others, a person is free to dispose of their property as they see fit." Adam v. Fletcher (In re Fletcher), 345 B.R. 592, (Bankr. N.D. Ohio 2006) (citing John Ownbey Co. v. Commissioner, 645 F.2d 540, 546 (6th Cir. 1981)).  In sum, Father and Corey simply did not present evidence sufficient to establish wilful and malicious conduct.

Father and Corey failed to prove by a preponderance of the evidence that Katy and/or Nakia willfully and maliciously undertook actions to injure Father and Corey.  Accordingly, Father and Corey are not entitled to relief under Section 523(a)(6).

_____

*The Court would be remiss in not pointing out that Katy's and Nakia's actions are less than  exemplary.  While Father clearly wanted to help them, and further expressed a desire to give his children their inheritance when they could use it most, the Court does not believe Father envisioned losing his real property in foreclosure in order for Katy and Nakia to keep the*

*Carrier Road Property for which they paid literally nothing.  While their lack of inaction toward payment of the Loan is self-serving and perhaps contemptuous, no evidence established their actions were fraudulent or willful and malicious, which is required to except a debt from discharge under Section 523(a)(2)(A) and (a)(6).*

## CONCLUSION

For the reasons set forth above,  Father and Corey failed to prove by a preponderance of the evidence that they are entitled to relief under Section 523(a)(2)(A) and (a)(6).  Therefore, judgment will be entered in favor of Katy and Nakia and against Father and Corey.

IT IS SO ORDERED.

#   #   #

22